USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4-13-15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WHITE LINES COM LLC,

                Plaintiff,

- against -

WINNINGTON NETWORKS LIMITED,

                Defendant.

**REPORT AND RECOMMENDATION**

13-CV-3059 (PGG) (RLE)

**TO THE HONORABLE PAUL G. GARDEPHE, U.S.D.J.:**

## I. INTRODUCTION

Plaintiff White Lines Com LLC ("White Lines") commenced this action against Defendant Winnington Networks Limited ("Winnington") for breach of contract, conversion, accounting, and unjust enrichment. (Doc. No. 1.) On April 3, 2014, the Honorable Paul G. Gardephe entered default judgment against Winnington and referred the case to the undersigned for an inquest on damages. (Doc. Nos. 32, 33.) For the reasons that follow, I recommend that the Court enter judgment for White Lines in the amount of **$8,959,443.60**.

## II. BACKGROUND

### A. Factual Background

#### 1. White Lines and EMS

White Lines is a financial investment group that was pursuing new ventures when it signed two contracts with Escrow Management Services, LLC and EMS Financial Services, LLC (collectively "EMS") in 2009 and 2011, respectively. (Complaint, Exs. A, B.) EMS is a global funds disbursement company, which serves as an escrow agent between multiple telecommunications parties. (Id., Ex. A.) At the time the contracts were signed, EMS was seeking to provide bridge financing to its customers who were resellers and purchasers of

international phone minutes. (*Id.*) White Lines agreed to lend EMS funds for the purpose of bridge financing, in exchange for interest on its loans. (*Id.*) In particular, White Lines agreed to make available up to $10,000,000 for bridge financing and EMS agreed to provide service marketing and management. (*Id.*, Ex. B.)

The bridge financing arrangement worked as follows: EMS and a reseller of international phone minutes entered into a funding agreement, which included an interconnect agreement between the reseller and a purchaser of phone minutes. (*Id.*, Exs. E-I.) EMS agreed to provide the reseller with a loan (from the bridge financing funds) that the reseller could not access directly, but which EMS held in escrow. (Complaint, ¶ 20.) The reseller and a purchaser of phone minutes negotiated an interconnect agreement that gave a purchaser immediate access to phone minutes in exchange for paying a premium rate as negotiated by the reseller. (*Id.*, ¶ 18.) EMS independently evaluated the agreement between the reseller and the purchaser, and oversaw all aspects of the transaction. (*Id.*, ¶ 19.) EMS then pre-approved the funding project and submitted a proposal with the funding terms to White Lines for final approval. (*Id.*, Ex. B.) Subsequently, White Lines transferred the bridge financing funds to EMS. (*Id.*)

EMS allocated the bridge financing funds to a "Project Account" respecting the interconnect agreement between the reseller and purchaser, but did not give the reseller direct access to this account. (Complaint, ¶ 20.) Instead, in accordance with the funding agreement between EMS and the reseller, EMS used the bridge financing funds to provide immediate payment to a seller of international phone minutes on behalf of the purchaser, giving the purchaser up to thirty additional days to submit payment. (*Id.*, ¶ 17.) Purchasers of international phone minutes needed this time cushion because they were not equipped to process invoices on an expedited basis, while sellers required immediate payment. (*Id.*, ¶ 16.)

In exchange for receiving services before tendering payment, purchasers agreed to pay a premium for the phone minutes at a rate negotiated with the reseller. (*Id.*, ¶ 18.) The premium covered: (1) the interest payment on the bridge financing funds divided between EMS and White Lines, who respectively receive 20 and 80 percent of the interest; and (2) a fee for the reseller. (*Id.*) The reseller guaranteed payment of the principal and interest on the bridge financing funds in case the purchaser defaulted. (*Id.*, Ex. B.)

As part of the contracts between White Lines and EMS, EMS agreed to include specific provisions in its funding agreements with resellers and purchasers. For example, one provision was to limit the transfer of payments from purchasers "only and directly" to an EMS specially designated bank account. (*Id.*) In other words, the provision prohibited purchasers of phone minutes from paying resellers directly for the minutes; instead, purchasers submitted payments to EMS. (*Id.*) EMS was responsible for closely monitoring payments due from customers. (Complaint, ¶ 19.) It was crucial that resellers not gain direct access to the bridge financing funds or purchasers' payments because resellers were only entitled to a limited fee for their role in brokering deals with the purchasers. (*Id.*, ¶ 20.) Resellers were not to receive any additional fees or interest payments; rather, EMS was to disburse a specified fee to a reseller within twenty-four hours of receiving payment from a purchaser. (*Id.*)

### 2. Winnington and EMS

Winnington is a reseller of international phone minutes that brokers deals with purchasers of minutes in exchange for a fee. (*Id.*, Ex. B.) Winnington signed five separate contracts with EMS that included interconnect agreements with five telecommunications purchasers. (*Id.*, Exs. E-I.) As part of the contracts with each purchaser, Winnington agreed to the following funding process: (1) EMS allocated funds to a "Project Account" upon project approval; (2) seller of

3

international phone minutes sent EMS and Winnington an invoice; (3) EMS paid the seller (using bridge financing funds); (4) Winnington billed the purchaser of the phone minutes at a rate higher than the seller charged; (5) purchaser submitted payment to EMS; and (6) EMS disbursed a fee to Winnington. (*Id.*)

The contracts that Winnington signed with EMS included interconnect agreements with five separate telecommunications purchasers as follows:

| Contract (Winnington-Purchaser) | Bridge Funds Offered (Principal Amount) | Interest Rate[1] |
| --- | --- | --- |
| Winnington-Colt (Complaint, Ex. F.) | $750,000 (inclusive of three transactions) | 2.5% every 15 days |
| Winnington-IDT (Complaint, Ex. I.) | $500,000 | 2.0% every 7 days |
| Winnington-KDDI (Complaint, Ex. H.) | $400,000 | 3.0% every 15 days |
| Winnington-Nowtel (Complaint, Ex. E.) | $710,000 (inclusive of two transactions) | 2.5% every 15 days |
| Winnington-Tata (Complaint, Ex. G.) | $100,000 | 2.0% every 7 days |

### 3. White Lines and Winnington

The underlying dispute between White Lines and Winnington arose when EMS negligently allowed Winnington to gain access and control over White Lines' funds for its own benefit. (Complaint, ¶ 24.) Thereafter, Winnington acknowledged receipt of White Lines' funds but failed to return these funds to White Lines. (*Id.*, ¶ 29.) EMS has since assigned its rights and interests to White Lines to recover the funds that EMS negligently allowed Winnington to access. (*Id.*, ¶ 32.) White Lines seeks to recover the principal amounts it loaned to EMS for each of the five contracts that Winnington entered into with EMS and phone minute purchasers,

---

[1] Under N.Y. Penal Law §§ 190.40 and 190.42, an interest rate that exceeds 25 percent annually is criminally usurious for loans less than $2.5 million. However, criminal usury is an affirmative defense. *Scantek Med., Inc. v. Sabella*, 582 F. Supp. 2d 472, 473 (S.D.N.Y. 2008). While the interest rates here exceed 25 percent annually, Winnington has not asserted an affirmative defense of criminal usury in its Answer. (Doc. No. 17.)

4

in addition to interest fees that White Lines would have received under those contracts. (*Id.*, ¶ 33.)

## B. Procedural Background

On May 6, 2013, White Lines filed a Complaint against Winnington. (Doc. No. 1.) Although Winnington initially retained counsel, the Court issued an Order on January 22, 2014, granting counsel's motion to withdraw. (Doc. No. 25.) Thereafter, Winnington failed to retain new counsel and did not appear at a default hearing for which the Court provided notice. On April 3, 2014, District Judge Paul G. Gardephe issued an Order of Default against Winnington and referred the matter to the undersigned for a hearing on damages. (Doc. Nos. 32, 33.) On April 29, 2014, Winnington failed to appear at the inquest hearing and the Court directed the Parties to submit memorandums regarding damages and attorneys' fees. (Doc. No. 35.)

## III. DISCUSSION

### A. Standard for Default Judgment

Rule 55 of the Federal Rules of Civil Procedure requires that a court enter default judgment against a party who has "failed to plead or otherwise defend." R. Civ. P. 55(a). After default judgment, a court accepts factual allegations as true, except those relating to damages. *Cotton v. Slone*, 4 F.3d 176 (2d Cir. 1993). While a court usually conducts an inquest hearing to determine damages, a hearing is not necessary where extensive documentary evidence is available. R. Civ. P. 55(b)(2); *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105 (2d Cir. 1997). A court should take any necessary steps to establish damages with reasonable certainty. *Id.* at 111. The damages awarded must not "differ in kind from" what the plaintiff demands in the pleadings. R. Civ. P. 54(c). *See also, Silge v. Merz*, 510 F.3d 157 (2d Cir. 2007).

Here, the Court ordered default judgment after Winnington failed to retain counsel and appear at a default hearing. (Doc. No. 33.) Winnington further failed to appear at an inquest hearing on damages and did not provide any documentary evidence regarding damages. White Lines has submitted sufficient documentary evidence to allow for a computation of damages. White Lines seeks a total of \$7,469,225.79[2] in damages and \$133,609.79[3] in legal fees and costs.

## B. Computation of Damages

### 1. Damages for Breach of Contract

Damages for breach of contract are determined by calculating the "amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract." *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490 (2d Cir. 1995). Unless the amount of damages is certain, a court entering default judgment is required to make an independent determination of the sum it awards. Fed. R Civ. P. 55. A court awards prejudgment interest according to the contractual interest rate. *Astoria Fed. Sav. and Loan Ass'n v. Rambalakos*, 49 A.D.2d 715, 716 (2d Dep't 1975).

Here, had Winnington fulfilled its five contracts with EMS, which assigned its rights to White Lines, White Lines would have received \$2,460,000 in principal in addition to \$6,365,623.81 in interest. The Court has made an independent determination of the amount owed to White Lines based on the principal and interest rate (see above chart) of bridge funds provided by White Lines to EMS for each of the five contracts that EMS signed with

---

[2] I recommend more than this amount because I have calculated the interest up to April 17, 2015. White Lines calculated the interest up to June 30, 2014.

[3] Although White Lines requested only \$133,609.79 in attorneys' fees, an independent calculation by the Court results in a total of \$133,819.79.

6

Winnington. As of April 17, 2015, White Lines would have received the following amounts in principal and interest fees:

| Contract (Winnington-Purchaser) | Principal Amount | Interest Fee As of April 17, 2015 |
|---|---|---|
| Winnington-Colt | $750,000.00 | $1,602,500.00 |
| Winnington-IDT | $500,000.00 | $1,845,714.29 |
| Winnington-KDDI | $400,000.00 | $1,029,600.00 |
| Winnington-Nowtel | $710,000.00 | $1,518,666.66 |
| Winnington-Tata | $100,000.00 | $369,142.86 |
| **TOTAL:** | **$2,460,000** | **$6,365,623.81** |

Thus, White Lines is entitled to $2,460,000 in principal. In addition, as of April 17, 2015, White Lines would have received $6,365,623.81 in interest[4]. Therefore, I recommend that the Court award **$8,825,623.81** in damages to White Lines.

### 2. Attorneys' Fees

The traditional "American rule" prohibits a prevailing party from recovering attorneys' fees in the absence of a statutory or contractual authorization. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 715 (1967); *Hall v. Cole*, 412 U.S. 1, 5 (1973). A prevailing party is entitled to attorneys' fees where an enforceable contract provides therefor. *Id.* The "lodestar" method for calculating attorneys' fees is the dominant approach in the federal courts. *Gisbrecht v. Barnhart*, 535 U.S. 789 (2002). Courts apply the lodestar method by multiplying the number of hours reasonably expended on litigation by a reasonable rate for the attorneys involved. *Grant v. Martinez*, 973 F.2d 96 (2d Cir. 1992).

---

[4] The Court calculated total interest by determining the interest due on each individual loan and summing the interest amounts. To determine the interest due on an individual loan, the Court multiplied the interest per cycle by the number of cycles leading up to April 17, 2015. The Court calculated interest per cycle by multiplying the principal and the interest rate. For example, the Winnington-Colt loan includes a principal of $750,000 at 2.5% interest rate every 15 days. To determine the interest due on the Winnington-Colt loan, the Court multiplied $750,000 x 0.025, resulting in $18,750 interest due per 15-day cycle; subsequently, the Court multiplied $18,750 by the number of 15-day cycles leading up to April 17, 2015.

To determine whether an hourly rate is reasonable, a court should consider legal services rates that prevail in the community. *Gierlinger v. Gleason*, 160 F.3d 858 (2d Cir. 1998). In particular, a court should consider similar services by lawyers of comparable skill, experience, and reputation. *Id.* at 882. The relevant community that a court should look to is the judicial district in which the trial court sits. *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145 (2d Cir. 1987). In addition, a court may rely on its own knowledge of hourly rates charged in private firms. *Miele v. New York State Teamsters Conference Pension & Ret. Fund*, 831 F.2d 407 (2d Cir. 1987). Reasonable rates for attorneys in this district have been found to be $425 per hour for a senior partner and $300 per hour for associates in a breach of contract case. *Sheehan v. Metro. Life Ins. Co.*, 450 F. Supp. 2d 321 (S.D.N.Y. 2006). Similarly, a court found that $385 per hour for a bankruptcy partner and $245 per hour for associates was reasonable. *Bank v. Ho Seo*, 2009 WL 5341672 (S.D.N.Y. 2009).

As for determining the reasonableness of hours expended, the court should consider time records submitted by the plaintiff that detail "for each attorney, the date, hours expended, and the nature of the work done." *New York State Assoc. for Retarded Children, Inc. v. Carey.* (2d Cir. 1983). Where the documentation of hours worked is inadequate, a district court may reduce the award accordingly. *Hensley v. Eckerhart*, 41 U.S. 424, 433 (1983).

In this case, a contractual obligation exists that justifies the court awarding attorneys' fees. In particular, all five contracts between EMS and Winnington include a provision that states:

> In the event of litigation by either party, the prevailing party shall be entitled to its reasonable expenses incurred in the enforcement of any part of this agreement, and those expenses shall, without limitation, include reasonable attorneys' fees plus other reasonable legal expenses incurred, all of which shall be payable hereunder.

(Complaint, Exs. E-I.) Since EMS assigned its rights and interests to White Lines, White Lines is entitled to reasonable attorneys' fees and costs incurred as a result of Winnington's breach of the five contracts.

Here, the attorneys' hourly rates correspond to similar rates approved by courts in this district. Furthermore, White Lines has provided documentation showing the hours expended by each attorney, the month in which the attorneys complete the legal work, and the nature of the work completed. More specifically, Paris Ackerman & Schmierer, LLP assigned the case to one partner over a span of approximately one year. The partner, Ross H. Schmierer, charged $300 an hour and worked on this case for 33 hours. (Schmierer Decl., Ex. B.) The firm also employed a paralegal at a rate of $90 for 0.8 hours and $100 for 0.1 hours. (*Id.*)

As for Podoll & Podoll, PC, the firm assigned the case to three partners, one associate, and two law clerks. The first partner, Richard B. Podoll, worked on the case for 189.55 hours at a rate of $400 per hour. (Kitsmiller Decl., Ex. B.). The second partner, Robert C. Podoll, worked for 1.5 hours at a rate of $400 per hour. (*Id.*) The third partner, Robert A. Kitsmiller, worked for 20.7 hours at a rate of $300 per hour. (*Id.*) The associate, Dustin J. Priebe, worked for 14.4 hours at a rate of $275 per hour. (*Id.*) Finally, the two law clerks each worked at a rate of $175 per hour, the first for 7.5 hours and the second for 7.9 hours. (*Id.*)

In light of the above, the attorneys for White Lines have charged a reasonable rate and expended a reasonable number of hours for their services. Multiplying the reasonable hourly rates by hours expended, I recommend that the total amount due for services is $9,982.00 to Paris Ackerman & Schmierer, LLP, and $113,817.50 to Podoll & Podoll, P.C. In addition, the firms are entitled to expenses in the amount of $569.45 to Paris Ackerman & Schmierer, LLP,

and $9,450.84 to Podoll & Podoll, P.C. Therefore, I recommend that the Court award White Lines a total of **$133,819.79** in attorneys' fees.

## IV. CONCLUSION

For the reasons stated above, I recommend that the Court award White Lines damages in the amount of $8,825,623.81 and legal fees and costs in the amount of $133,819.79, for a total of **$8,959,443.60.**

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Paul G. Gardephe, 40 Foley, Room 2204, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 1970, New York, New York 10007. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(d).

**DATED: April 13, 2015**
**New York, New York**

Respectfully Submitted,

The Honorable Ronald L. Ellis
United States Magistrate Judge